MILLER, J.
*936 Petitioner Gregory White challenges the constitutionality of his conviction for second degree felony murder ( Pen. Code, § 187 )[1] on the basis of the United States Supreme Court's decision in *937 Johnson v. United States (2015) --- U.S. ----, 135 S.Ct. 2551, 192 L.Ed.2d 569 ( Johnson ), and seeks relief via a petition for writ of habeas corpus. We have determined that the petition must be denied on this record.[2] *672 I
FACTUAL BACKGROUND[3]
On October 25, 2000, at approximately 11:00 p.m., petitioner helped his friend, Brian Keith Rhea (Rhea), to "pull" or extract methamphetamine *938 dissolved in a container of Coleman fuel.[4] The Coleman fuel was left over from a previous methamphetamine manufacture. Petitioner picked Rhea up at Rhea's home, where he lived with girlfriend Linda Loerch (Loerch). Petitioner and Rhea were long-time friends, and petitioner was driving Rhea's truck, which he had borrowed. Both petitioner and Rhea smoked some methamphetamine while Rhea retrieved the leftover Coleman fuel. Petitioner drove Rhea to the home of Steven Burtness (Burtness). The area included several other residential trailers. Petitioner parked at another residence, that of Mr. Hornsby. Burtness owned a converted school bus used for manufacturing methamphetamine, outfitted with electrical outlets. Petitioner had obtained Burtness's permission to use the bus, in return for a share of the "pulled" methamphetamine.
Rhea's first attempt, in which he tried to "gas" the methamphetamine out of the Coleman fuel, was unsuccessful and he wanted to try a different method with a hot plate. Petitioner went to Burtness's trailer and asked to use a hot plate. Burtness directed him to the kitchen or back out to the bus. Petitioner returned to the bus with a hot plate, to find Rhea already using an older hot plate with exposed coils. Rhea was using it to boil off saturated Coleman fuel in a bowl on top of the *673 "antique" hot plate to recover methamphetamine. The back door of the bus was wedged open. Rhea was wearing gloves that had become soaked in the Coleman fuel. As petitioner saw the old hot plate, the bowl containing about a quart of the Coleman fuel cracked and the fuel ran into the red-hot coils, causing a flash fire. The fuel splashed on the ground and flamed up, catching petitioner in the face. Petitioner was burned, but not as severely as Rhea. He ran to get out of the front of the bus. Rhea stepped back out the back of the bus. Rhea was burned more severely and exacerbated it by trying to put out the flames with his glove-covered hand, which was soaked in Coleman fuel and spread the flames on his body. Petitioner tackled him and managed to get the flames out, rolling Rhea and throwing dirt on him. Between Burtness, who had come outside, and petitioner, they put the fire out on the bus; petitioner used a hose to water down Rhea and ease the pain from his burns.
Petitioner and Rhea walked back to the truck but could not find the keys. Petitioner borrowed Burtness's truck. He intended to take Rhea to the hospital, but Rhea wanted to go home. Petitioner was also concerned the hospital might get the truck's license place and he would be tracked down. They went to Rhea's trailer, where Loerch met them. Rhea was in worse pain. Petitioner told Loerch to take Rhea to the hospital and Rhea would say *939 he was burned in an engine backfire. He left; Loerch took Rhea to the hospital. Rhea died later of his injuries. Eventually, petitioner was questioned by law enforcement.
Petitioner was charged in a two-count information with the murder of Rhea (count 1; Pen. Code, § 187 ) and with manufacturing methamphetamine (count 2; Health & Saf. Code, § 11379.6, subd. (a) ). It was further alleged that defendant had one prison prior ( Pen. Code, § 667.5, subd. (b) ) and had a prior conviction for possessing ephedrine for the manufacture of methamphetamine, an enhancement in count 2 ( Health & Saf. Code, §§ 11383, subd. (c) & 11370.2, subd. (b) ). ( White , supra , E034877, at p. 2.)
On count 1, the jury was instructed on second degree implied malice murder and second degree felony murder. The evidence showed that an explosion occurred while defendant and Rhea were manufacturing methamphetamine. Rhea suffered extensive second and third degree burns, and later died of his injuries. The jury found defendant guilty of second degree felony murder; guilty as charged in count 2; and found the prison prior and enhancement allegations true. The jury specially found that the murder "occurred during the commission of the crime of manufacturing methamphetamine" and that the murder "was not committed with implied malice." ( White , supra , E034877, at p. 2.)
Petitioner was sentenced to 19 years to life, consisting of 15 years to life on count 1, plus three years for the enhancement on count 2, plus one year for the prison prior. The upper term of seven years was imposed but stayed on count 2. On direct appeal, we stayed the three-year enhancement on count 2, and otherwise affirmed. ( White , supra , E034877, at pp. 2, 34.)
Petitioner filed his initial petition for writ of habeas corpus on this issue in Riverside Superior Court case No. RIC1512917, after the United States Supreme Court issued its 2015 opinion in Johnson . That petition was denied on November 6, 2015. He then filed his habeas petition, including the instant issue, before us in our case No. E065246. We summarily denied the petition on February 3, 2016. Petitioner then filed his habeas petition before the California Supreme Court, in case No. S233265 on March 24, 2016. Respondent *674 filed an informal response in the Supreme Court on August 31, 2016; petitioner, acting in propria persona, filed a reply on October 20, 2016.
On July 26, 2017, the Supreme Court issued the following order: "The Secretary of the Department of Corrections and Rehabilitation is ordered to show cause before the Second Division of the Fourth District Court of Appeal, when the matter is placed on calendar, why petitioner is not entitled *940 to a reversal of his second degree felony murder conviction because the reasoning set forth in Johnson v. United States (2015) --- U.S. ----, 135 S.Ct. 2551, 192 L.Ed.2d 569 renders the California second-degree murder[5 ] rule unconstitutionally vague. (See also Lee, Why California's Second-Degree Felony-Murder Rule is Now Unconstitutionally Vague (2015) Hastings Const. L. Q., Forthcoming; UC Hastings Research Paper No. 158.)[6 ] The return is to be filed on or before August 25, 2017." We appointed counsel in the instant case.
After extensions of time, respondent filed a return on October 12, 2017. After further extensions of time, petitioner filed a traverse by appointed counsel on February 26, 2018,[7] followed by a letter notice on May 8, 2018, as to a new United States Supreme Court case arising from Johnson , Sessions v. Dimaya (2018) --- U.S. ----, 138 S.Ct. 1204, 200 L.Ed.2d 549 ( Dimaya ), which petitioner contends is applicable to arguments in his traverse. Petitioner filed a second letter notice on October 17, 2018, as to a new United States Court of Appeals for the Ninth Circuit case, Henry v. Spearman (9th Cir. 2018) 899 F.3d 703 ( Henry ), which he also contends is applicable to arguments in his traverse.
II
DISCUSSION
Petitioner seeks a writ of habeas corpus to vacate his conviction of second degree felony murder. He contends that the United States Supreme Court's ruling in Johnson that the residual clause of the Armed Career Criminal Act, 18 U.S.C.S. section 924(e)(2)(B)(ii) (hereafter ACCA), is unconstitutionally vague and fails to meet the due process requirement of notice to potential defendants but invites arbitrary enforcement by judges, and applies equally to California's second degree felony-murder rule. As we discuss herein, there are some general similarities and some differences between the categorical approach analysis to the ACCA's residual clause that the United States Supreme Court found unconstitutionally vague in Johnson and the abstract analysis under California law for the second degree felony-murder rule. However, on this record, we do not find unconstitutional vagueness in *941 petitioner's conviction for second degree felony murder for the death of an accomplice arising out of the felonious manufacture of methamphetamine. Accordingly, we will deny the petition. *675 The thoughtful dissent would apply Johnson to find California's former second degree felony-murder rule unconstitutionally vague in general. ("Under Johnson , then, a statute fails to provide ordinary people fair notice of what is criminal when it requires courts to apply an indefinite standard to an abstract construction of a statute that is not tied to their own conduct. This holding condemns few laws, but, in my view, one of them is California second degree felony murder.") (Dis. opn. post , at p. 693, fn. omitted.) Also, "my view is that our second degree felony-murder law is unconstitutionally vague under Johnson because it has a defendant's guilt depend on a court's evaluation of a hypothetical risk posed by an abstract generic version of the offense." (Dis. opn. post , at p. 699.) We respect his viewpoint but emphasize again that we limit this decision to this record presented before us in this case, which we hold does not support such a finding.
The dissent contends that the California approach to assessing "inherent dangerousness to human life" is to consider " 'whether the felony "by its very nature ... cannot be committed without creating a substantial risk that someone will be killed ...." [Citations.]' ( People v. Howard (2005) 34 Cal.4th 1129, 1135, 23 Cal.Rptr.3d 306, 104 P.3d 107 ( Howard ).)" (Dis. opn. post , at p. 693.) In making that assessment, courts look to " ' "the elements of the felony in the abstract , 'not the "particular" facts of the case,' i.e., not to the defendant's specific conduct." ' " (Dis. opn. post , at p. 693.) On that basis, the dissent posits, if there is a way for a felony to be committed without a high probability of death, it cannot be " 'inherently dangerous to human life' " or act as "a predicate for second degree felony murder." (Dis. opn. post , at p. 694.)
In Howard , for example, our Supreme Court found that a violation of Vehicle Code section 2800.2, " 'driving in willful or wanton disregard for the safety of persons or property while fleeing from a pursuing police officer' " ( Howard , supra , 34 Cal.4th at p. 1134, 23 Cal.Rptr.3d 306, 104 P.3d 107 ), specified that the act included without limitation, "driving while fleeing or attempting to elude a pursuing peace officer during which time either three or more violations that are assigned a traffic violation point count under Section 12810 occur, or damage to property occurs." ( Veh. Code, § 2800.2, subd. (b).) Our Supreme Court observed that violations assigned points under Vehicle Code section 12810 that "can be committed without endangering human life include driving an unregistered vehicle owned by the driver ..., driving with a suspended license ..., driving on a highway at slightly more than 55 miles per hour when a higher speed limit has not been posted ..., failing to come to a *942 complete stop at a stop sign ..., and making a right turn without signaling for 100 feet before turning." ( Howard , at pp. 1137-1138, 23 Cal.Rptr.3d 306, 104 P.3d 107 [Vehicle Code sections omitted].) Because Vehicle Code section 2800.2 could be violated in these ways without being inherently dangerous to human life, "the second degree felony-murder rule does not apply when a killing occurs during a violation of section 2800.2." ( Howard , at p. 1139, 23 Cal.Rptr.3d 306, 104 P.3d 107.) Similarly, as the dissent correctly points out, this maxim has been applied in People v. Burroughs (1984) 35 Cal.3d 824, 201 Cal.Rptr. 319, 678 P.2d 894 (practicing medicine without a license under conditions creating a risk of great bodily harm, serious physical or mental illness, or death because the "great bodily injury" could be non-life-threatening); People v. Henderson (1977) 19 Cal.3d 86, 137 Cal.Rptr. 1, 560 P.2d 1180 (felony false imprisonment may be *676 effected by violence, menace, fraud, or deceit under the then-existing Pen. Code, § 237 ; inherently dangerous when effected by violence or menace, but not if effected by fraud or deceit); and People v. Caffero (1989) 207 Cal.App.3d 678, 255 Cal.Rptr. 22 (felony child abuse is not inherently dangerous because "great bodily harm" might not endanger human life).
These cases are distinguishable. First, as we explain, post , the determination of "inherent dangerousness to human life" in this methamphetamine manufacturing case is based on expert testimony as to a scientific process in chemistry and physics. It is not, as the dissent suggests, a "hypothetical" evaluation. The " 'defendant's specific conduct,' " Howard , supra , 34 Cal.4th at p. 1135, 23 Cal.Rptr.3d 306, 104 P.3d 107, was not considered in making this determination. The elements of the felony, manufacturing methamphetamine, were considered but the abstract was made concrete by the expert testimony on the nature and processes involved in the manufacture of the drug. In so doing, the trial court, and we, concluded that felonious manufacturing of methamphetamine is inherently dangerous to human life for purposes of the second degree felony-murder rule. Taking evidence of the dangerousness is supported in precedent discussed herein, including by our Supreme Court. ( People v. Patterson (1989) 49 Cal.3d 615, 262 Cal.Rptr. 195, 778 P.2d 549.)
Moreover, the determination that an individual evading police pursuit in a willful and wanton manner, for example, might still do so without acting with inherent dangerousness to human life arises from the nature of the specified traffic violations in the statute. Thus, failure to signal a turn or to "sedately" speed slightly above the posted speed limit may not be inherently dangerous. In the case of feloniously manufacturing methamphetamine ( Health & Saf. Code, § 11379.6, subd. (a) ), however, there are no such "safe" violations. Suggesting that some individuals have produced many batches of methamphetamine without fire or explosion simply recounts an exercise in experience-yet, gaining experience generally extracts a price. Unlike the case of avoiding police pursuit where any driver regardless of experience could operate his or her vehicle "relatively safely," there is no suggestion that the *943 novice (or even the skilled) methamphetamine maker has or can obtain the experience necessary to manufacture many times before an incident, including death, occurs.
Second, California courts have held felonies inherently dangerous to human life. In addition to our prior manufacturing methamphetamine case in People v. James (1998) 62 Cal.App.4th 244, 74 Cal.Rptr.2d 7 ( James ) discussed post , felonies including poisoning with intent to injure ( People v. Mattison (1971) 4 Cal.3d 177, 93 Cal.Rptr. 185, 481 P.2d 193 ); grossly negligent discharge of a firearm ( People v. Clem (2000) 78 Cal.App.4th 346, 92 Cal.Rptr.2d 727, but see, People v. Robertson (2004) 34 Cal.4th 156, 17 Cal.Rptr.3d 604, 95 P.3d 872 ); kidnapping ( People v. Greenberger (1997) 58 Cal.App.4th 298, 68 Cal.Rptr.2d 61 ); and reckless or malicious possession of a destructive device ( People v. Morse (1992) 2 Cal.App.4th 620, 3 Cal.Rptr.2d 343 ( Morse ) ), are all found inherently dangerous. In addition, other felonies have been found to be inherently dangerous to human life, such as shooting at an inhabited dwelling ( People v. Hansen (1994) 9 Cal.4th 300, 36 Cal.Rptr.2d 609, 885 P.2d 1022 ) and shooting at an occupied vehicle ( People v. Tabios (1998) 67 Cal.App.4th 1, 78 Cal.Rptr.2d 753 ) (both Pen. Code, § 246 ). Hansen was overruled and Tabios disapproved by *677 People v. Chun (2009) 45 Cal.4th 1172, 1199, 91 Cal.Rptr.3d 106, 203 P.3d 425 ( Chun ), not because their respective felonies were not inherently dangerous to human life, but because they were assaultive in nature, merged with the charged homicide, and thus could not be the basis for second degree felony murder. That is not implicated here.
Third, one of the dissent's main premises regarding the instant case (as opposed to the bigger picture of second degree felony murder in general) is that conceivably there are ways to manufacture methamphetamine "relatively" safely, meaning that the felony is not a basis for felony murder. We will address this, but we point out here that we rejected this argument in our prior decision in James , supra , 62 Cal.App.4th at p. 270, 74 Cal.Rptr.2d 7 (relying on Morse , supra , 2 Cal.App.4th at p. 646, 3 Cal.Rptr.2d 343 ): " 'Appellant argues that because there are "conceivable [ ] ways of violating the statute that do not necessarily pose a threat to human life" the crime is not inherently dangerous. ... [¶] We must view the elements of the offense, not the particular facts of the instant offense. In viewing the elements our task is not to determine if it is possible (i.e., "conceivable") to violate the statute without great danger. By such a test no statute would be inherently dangerous. Rather the question is: does a violation of the statute involve a high probability of death? [Citation.] If it does, the offense is inherently dangerous.' " Under this "any conceivable" test, any of the long-standing cases finding inherent danger to human life could be invalidated. But, as noted above, in viewing the elements of methamphetamine manufacture, we (and the trial court) also viewed expert testimony on the scientific process of the manufacture, rendering a more *944 concrete view of the felony in place of an abstract. In James , we found the felony inherently dangerous to human life on this augmented review, as we do here. We note that the dissent also questions the determination of a "high probability of death." We address that as well.
A. Standard
"A habeas corpus remedy may be available when relief by direct appeal is inadequate. [Citation.]" ( In re Figueroa (2018) 4 Cal.5th 576, 587, 229 Cal.Rptr.3d 673, 412 P.3d 356.) Petitions for a writ of habeas corpus are evaluated by asking whether, if the factual allegations are true, the petitioner would be entitled to relief. ( Ibid . ) " 'Because a petition for a writ of habeas corpus seeks to collaterally attack a presumptively final criminal judgment, the petitioner bears a heavy burden initially to plead sufficient grounds for relief, and then later to prove them. [Citation.]' " ( Ibid. , italics omitted.)
In his traverse, petitioner states for the first time that he is currently released on parole. Accepting this assertion as true, which counsel affirmed at oral argument, as a parolee he is still entitled to habeas review because he remains under restraint, despite not being in physical custody. ( People v. Villa (2009) 45 Cal.4th 1063, 1069, 90 Cal.Rptr.3d 344, 202 P.3d 427 ; People v. Cruz-Lopez (2018) 27 Cal.App.5th 212, 221, 237 Cal.Rptr.3d 873.)
B. Analytical Framework
In Johnson , the United States Supreme Court considered the statutory ACCA's ban on firearm possession to certain persons, and how its applicability was determined. It observed, "Federal law forbids certain people-such as convicted felons, persons committed to mental institutions, and drug users-to ship, possess, and receive firearms. § 922(g). In general, the law punishes violation of this ban by up to 10 years' imprisonment. § 924(a)(2). But if the violator has three or more earlier convictions for a 'serious drug offense' or a *678 'violent felony,' the Armed Career Criminal Act increases his prison term to a minimum of 15 years and a maximum of life. § 924(e)(1) ; Johnson v. United States , 559 U.S. 133, 136, 130 S.Ct. 1265, 176 L.Ed.2d 1 (2010). The Act defines 'violent felony' as follows:
'any crime punishable by imprisonment for a term exceeding one year ... that-
'(i) has as an element the use, attempted use, or threatened use of physical force against the person of another; or *945 '(ii) is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another .' § 924(e)(2)(B) (emphasis added)." ( Johnson , supra , --- U.S. ----, 135 S.Ct. at pp. 2555-2556.) The italicized portion is the "residual clause" of the ACCA. ( Ibid . ) The Supreme Court explained that the ACCA "requires courts to use a framework known as the categorical approach when deciding whether an offense 'is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another.' " ( Id . at p. 2557.) "Under the categorical approach, a court assesses whether a crime qualifies as a violent felony 'in terms of how the law defines the offense and not in terms of how an individual offender might have committed it on a particular occasion.' [Citation.]" ( Ibid . )
To do so, a court must "picture the kind of conduct that the crime involves in 'the ordinary case,' and to judge whether that abstraction presents a serious potential risk of physical injury. [Citation.]" ( Johnson , supra , --- U.S. ----, 135 S.Ct. at p. 2557.) This goes beyond determining whether creation of risk is an element of the crime; instead, asking whether the crime involves conduct that presents too much risk of physical injury. ( Ibid . ) Complicating the decision, the inclusion of the enumerated crimes of burglary and extortion take the analysis "beyond evaluating the chances that the physical acts that make up the crime will injure someone," given that burglary and extortion do not normally cause physical injury. ( Ibid . )
In that light, the Supreme Court found that, first, the residual clause left grave uncertainly about how to estimate the risk posed by a crime by tying that assessment to a judicially imagined " 'ordinary case' " of a crime instead of real-world facts or statutory elements. It questioned how to imagine a criminal's behavior and, further, how the idealized ordinary case of the crime subsequently plays out in assessing potential risk. ( Johnson , supra , --- U.S. ----, 135 S.Ct. at pp. 2557-2558.) Second, the residual clause left uncertainty about how much risk it takes for a crime to qualify as a violent felony. ( Id . at p. 2558.) The United States Supreme Court found that "[b]y combining indeterminacy about how to measure the risk posed by a crime with indeterminacy about how much risk it takes for the crime to qualify as a violent felony, the residual clause produces more unpredictability and arbitrariness than the Due Process Clause tolerates." ( Ibid . ) Thus, the United States Supreme Court found the residual clause of the ACCA to be unconstitutionally vague.
In Dimaya , the U.S. Supreme Court found a similar constitutional infirmity in the residual clause of the Immigration and Nationality Act *946 (INA). The U.S. Supreme Court explained, "The INA defines 'aggravated felony' by listing numerous offenses and types of offenses, often with cross-references to federal criminal statutes. [ 8 U.S.C.S.] § 1101(a)(43) ; see Luna Torres v. Lynch , 578 U.S. ----, ----, 136 S.Ct. 1619,[ 1623,] 194 L.Ed.2d 737, 739 (2016). According to one item on that long list, an aggravated felony includes 'a crime of violence *679 (as defined in section 16 of title 18 ...) for which the term of imprisonment [is] at least one year.' § 1101(a)(43)(F). The specified statute, 18 U.S.C. § 16, provides the federal criminal code's definition of 'crime of violence.' Its two parts, often known as the elements clause and the residual clause, cover:
'(a) an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or
'(b) any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.'
Section 16(b), the residual clause, is the part of the statute at issue in this case." ( Dimaya , supra , 138 S.Ct. at p. 1211.) The U.S. Supreme Court found 18 U.S.C.S. section 16 structurally similar to 18 U.S.C.S. section 924(e)(2)(B) (ACCA) and its residual clause in subdivision (e)(2)(B)(ii), and subject to the analysis in Johnson despite the absence of any enumerated felonies in the INA's subdivision (b). ( Dimaya , at pp. 1215-1216.) Applying that analysis, the U.S. Supreme Court affirmed the judgment of the United States Court of Appeals for the Ninth Circuit, finding the INA's residual clause unconstitutionally vague. ( Dimaya , at pp. 1212, 1223.)
In comparison, California's former second degree felony-murder rule, which the California Supreme Court has interpreted as broad statutory language despite its roots in common law ( Chun , supra , 45 Cal.4th at pp. 1181-1188, 91 Cal.Rptr.3d 106, 203 P.3d 425 ), "makes a killing while committing certain felonies murder without the necessity of further examining the defendant's mental state." ( Id . at p. 1182, 91 Cal.Rptr.3d 106, 203 P.3d 425.) "First degree felony murder is a killing during the course of a felony specified in section 189, such as rape, burglary, or robbery. Second degree felony murder is 'an unlawful killing in the course of the commission of a felony that is inherently dangerous to human life but is not included among the felonies enumerated in section 189 ....' [Citation.]" ( Chun , at p. 1182, 91 Cal.Rptr.3d 106, 203 P.3d 425.)[8]
*947 " 'In determining whether a felony is inherently dangerous, the court looks to the elements of the felony in the abstract, "not the 'particular' facts of the case," i.e., not to the defendant's specific conduct. [Citation.]' [Citations.]" ( James , supra , 62 Cal.App.4th at p. 258, 74 Cal.Rptr.2d 7 ; see Chun , supra , 45 Cal.4th at p. 1188, 91 Cal.Rptr.3d 106, 203 P.3d 425 ["Whether a felony is inherently dangerous is determined from the elements of the felony in the abstract, not the particular facts. [Citation.]"].) " ' "This form of [viewed-in-the-abstract] analysis is compelled because there is a killing in every case where the rule might potentially be applied. If in such circumstances a court were to examine the particular facts of the case prior to establishing whether the underlying felony is inherently dangerous, the court might well be led to conclude the rule applicable despite any unfairness which might redound to the defendant by so broad an application: the existence of the dead victim might appear to lead inexorably to the conclusion that the underlying felony is exceptionally hazardous." ' " ( James , at p. 258, 74 Cal.Rptr.2d 7, quoting *680 Patterson , supra , 49 Cal.3d at p. 622, 262 Cal.Rptr. 195, 778 P.2d 549.)
As we discuss herein, the California approach also admits of the possibility of taking expert testimony and scientific evidence on the issue of determining whether a felony is inherently dangerous to human life, in the appropriate case.
This comparison highlights some of the differences between the approach taken to analyze prior felonies under the ACCA's residual clause and the approach taken to analyze a current felony under the pre-2019 second degree felony-murder rule. For one thing, the California rule used the actual elements of the crime to create an "abstract" of the felony while the ACCA approach takes two branches. First, the enumerated crimes (burglary, arson, extortion, or involving the use of explosives) are analyzed by hypothesizing a generic crime encompassing how that crime would theoretically be committed across a multitude of jurisdictions and states. Second, crimes under the residual clause (unenumerated crimes involving conduct that presents a serious potential risk of physical injury to another) are analyzed according to the state-based elements of the individual offense. California's former second degree felony-murder rule had no such dichotomy. In fact, discussed further, post , the second degree felony-murder rule did not relate to or even contain any specifically enumerated felonies, as does section 924(e)(2)(B)(ii) of the ACCA. The U.S. Supreme Court discussed the need for this approach. The emphasis in the ACCA is on prior convictions . That is, specifically, enhancements for prior qualifying violent felonies or drug offenses under the ACCA rests solely on the existence of those prior convictions, not the conduct underlying them. ( Johnson , supra , --- U.S. ----, 135 S.Ct. at p. 2562.) The Court also considered "the utter impracticability of requiring a sentencing court to reconstruct, long after the original conviction, the conduct underlying that conviction," using as an example a conviction on a guilty plea with no record of the underlying facts. ( Ibid . ) Those prior convictions could be in *948 diverse state and federal jurisdictions with varying elements or qualifying conduct with regard to the laws violated. Such considerations were not present with California's former second degree felony-murder rule.[9]
Further, the very need to consider felonies that "otherwise involves conduct that presents a serious potential risk of physical injury to another" ( 18 U.S.C.S. § 924(e)(2)(B)(ii) ), in light of the specifically enumerated felonies of burglary, arson, extortion, or involving use of explosives, (ibid. ), was never implicated in California's second degree felony-murder rule, unlike under the Supreme Court's original analysis of the ACCA in Johnson . For purposes of second degree felony-murder analysis, the enumerated felonies listed in Penal Code section 189 defined first degree murder (now enumerated in current § 189, subd. (a) ). But, "[a]ll other kinds of murder are of the second degree." (Former § 189 ; now contained in current § 189, subd. (b).) A determination of second degree murder, including felony murder, therefore, was not considered in the light of, or with the need to compare, the enumerated felonies applicable to the wholly separate first degree murder determination.
*681 That is different from the approach originally undertaken in Johnson under the ACCA. We acknowledge that Professor Lee claims to the contrary in his article. (Lee, 43 Hastings Const. L.Q. at pp. 47-49.) He contends that the sentence quoted immediately above is itself a residual clause inviting comparison with the enumerated felonies before it. However, the residual clause of the ACCA specifically invokes its enumerated felonies ("burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another") in defining " 'violent felon[ies].' "[10] ( 18 U.S.C.S. § 924(e)(2)(B).) On the other hand, the enumerated felonies in former section 189 define first degree murder. The final sentence of that paragraph, which Professor Lee argues is the residual *949 clause, strikes out in a different direction, excluding the enumerated felonies comprising first degree murder and defining the separate offense of second degree murder. We do not see that sentence as a "residual clause."
Notwithstanding, while not trivial, these differences do not form the basis of our opinion. Here, petitioner's conviction did not simply rest on an abstract, elements-based analysis of the inherent dangerousness of the underlying crime, manufacturing methamphetamine. Instead, the trial court relied on real-world, concrete evidence on the issue of inherent dangerousness. It simply was not real-world evidence of petitioner's particular facts.
C. Manufacturing Methamphetamine is Inherently Dangerous to Human Life
We have no difficulty finding inherent dangerousness here. First, in James , this court considered the felonious manufacture of methamphetamine as a qualifying inherently dangerous felony for the second degree murder rule. We reasoned that, "Whether a felony is inherently dangerous for purposes of the second degree felony-murder rule is a question of law, or, at a minimum, a mixed question of law and fact, which we review de novo." ( James , supra , 62 Cal.App.4th at p. 259, 74 Cal.Rptr.2d 7, citing People v. Taylor (1992) 6 Cal.App.4th 1084, 1090-1094, 8 Cal.Rptr.2d 439 ( Taylor ).) In that light, we also considered what evidence we could look to in determining inherent dangerousness. ( Taylor , at pp. 1090-1094, 8 Cal.Rptr.2d 439.)
Our review of second degree felony-murder cases found that many cases made the determination of inherent dangerousness to human life on the elements of the respective crime, without resort to other evidence. ( James , supra , 62 Cal.App.4th at pp. 259-260, 74 Cal.Rptr.2d 7.) However, at *682 the time we decided James , at least two cases we reviewed involved considering evidence to make the inherent dangerousness determination. One was Patterson , in which our Supreme Court directed the Court of Appeal to remand the matter (whether furnishing cocaine is inherently dangerous to human life) to the trial court to consider "various medical articles and reports that assertedly demonstrate that the offense of furnishing cocaine is sufficiently dangerous to life to constitute an inherently dangerous felony," of which the People had requested the Supreme Court take judicial notice. ( Patterson , supra , 49 Cal.3d at p. 625, 262 Cal.Rptr. 195, 778 P.2d 549.)[11] *950 The other was Taylor , a case of furnishing phencyclidine (PCP) to a victim who drowned under its influence. ( Taylor , supra , 6 Cal.App.4th at p. 1088, 8 Cal.Rptr.2d 439.) The trial court had heard expert testimony from both sides at trial regarding whether furnishing PCP is inherently dangerous and ruled that it was an inherently dangerous felony; the jury convicted that defendant of murder on that theory. The Court of Appeal found the issue subject to de novo review and stated, "One might wonder why, if the issue is a question of law to be independently reviewed, the Supreme Court in People v. Patterson [ ] ordered the matter remanded to the trial court, and why we did the same here. The answer is that the determination of a 'high probability of death' depends, at least somewhat, on evidence as to the dangerousness of the underlying felony in the abstract, evidence which is best garnered from testimony by experts. Appellate courts have often used evidence gathered by trial courts and referees as the basis for de novo legal rulings." ( Taylor , at p. 1094, 8 Cal.Rptr.2d 439 ; James , at p. 261, 74 Cal.Rptr.2d 7.) Based on these cases, we observed, " Patterson and Taylor thus permit a court to consider evidence of whether a felony is inherently dangerous. This is a practical necessity when the danger claimed to be inherent in the elements of a felony is a matter of scientific, medical or technological expertise, rather than common knowledge." ( James , at p. 261, 74 Cal.Rptr.2d 7.)
In fact, we viewed-and still do view-the circumstances in James as analogous as to whether a new scientific technique is generally accepted within the relevant scientific community so as to be admissible under the Kelly / Frye rule.[12] ( James , supra , 62 Cal.App.4th at p. 262, 74 Cal.Rptr.2d 7.) Necessarily, that viewpoint applies to the instant case as well.
In James , the evidence presented in the trial court detailed the various steps in manufacturing methamphetamine, supported by the testimony of several expert witnesses. The most common method is using ephedrine or pseudoephedrine from a medication. ( James , supra , 62 Cal.App.4th at p. 263, 74 Cal.Rptr.2d 7.) The first step is to extract the ephedrine or pseudoephedrine from the medication, using a solvent such as distilled water, denatured alcohol, Coleman fuel, and acetone. This process may be accelerated with heating; both acetone and Coleman fuel are flammable, adding the risk of a flash fire.
*683 ( Ibid . ) The second step is to mix the ephedrine with red phosphorus and hydriodic acid, both dangerous substances, and apply heat for six to 72 hours. ( Ibid . ) Iodine or iodine and muriatic acid are sometimes substituted for hydriodic acid, because it is illegal to possess. ( Ibid . ) The third step converts the product from an acid to a base, generally by adding lye, which produces substantial heat. If not cooled with ice, the solution may splatter. ( Ibid . ) The fourth step extracts methamphetamine with a solvent like Coleman fuel, trichloroethylene or Freon. ( Ibid . ) The fifth step, called gassing, applies *951 hydrochloric acid or sulfuric acid to rock salt or table salt. The gas produced and applied to the solution causes the methamphetamine to crystalize. ( Ibid . ) A sixth step sometimes used washes the methamphetamine with acetone to make it whiter. ( Ibid . ) Every step of this process is dangerous. Acetone and its vapors, and Coleman fuel and its vapors are extremely flammable; iodine crystals are poisonous; red phosphorus explodes in contact with a flame and creates poisonous gas if overheated, and flames are often present in the manufacture of methamphetamine; the acids described above can burn; and fumes from the chemicals cause lung damage. ( Ibid . ) An alternative method of manufacture other than ephedrine involves the " 'P2P' " (phenyl-2-propanone) method, which uses ether, also volatile and flammable. ( Id . at p. 264, 74 Cal.Rptr.2d 7.)
These steps and methods were described in full from real-world crime site investigation and observation, experience and known chemical processes. Several experienced witnesses from the California Department of Justice and elsewhere testified as to details of methamphetamine laboratories and fires/explosions. ( James , supra , 62 Cal.App.4th at p. 264, 74 Cal.Rptr.2d 7.) In addition, we examined California cases in related areas not involving second degree felony murder, but which detailed the dangers of producing methamphetamine in an unprofessional laboratory. ( Id . at pp. 265-267, 74 Cal.Rptr.2d 7.) Further, cases from other jurisdictions also detailed the same dangers. ( Id . at pp. 268-269, 74 Cal.Rptr.2d 7.)
Having considered the evidence adduced before the James trial court, the testimony of experts on the issue of illicit manufacture of methamphetamine and its dangers, and the various cases in diverse jurisdictions, we concluded that "the trial court correctly ruled that manufacturing methamphetamine is inherently dangerous to human life for purposes of the second degree felony-murder rule." ( James , supra , 62 Cal.App.4th at p. 271, 74 Cal.Rptr.2d 7.)
Turning to the instant case, the trial court here cited James and built on its foundation with additional expert testimony on the issue of manufacturing methamphetamine, including in the form of "pulling" methamphetamine from leftover, meth-saturated solvent. Sheriff's investigator Thomas Salisbury testified he was involved in meth lab investigations since 1986; was present and assisted in the investigation of "probably 1,000 meth labs to date, typically investigating somewhere in the area of 300 a year"; was intimately familiar with methamphetamine, its use, its packaging and sale and the manner of manufacture based on his interaction with manufacturers and users; and, had personally manufactured methamphetamine five times under controlled conditions. He has testified in court as an expert with regard to methamphetamine labs or methamphetamine lab fires 300 times.
He first described the "Reader's Digest" version of manufacture as, "you get over-the-counter cold medication such as Sudafed or Actifed or something *952 that has the active ingredient pseudoephedrine in it. *684 You take the oxygen molecule away from that pill, away from the pseudoephedrine, and you have methamphetamine. That's the Reader's Digest version." He then continued in detailed steps: crushing the pills and mixing them with a solvent, such as methanol and denatured alcohol; filtering the solution to remove binders in the pills, such as starch; and boiling the flammable liquid so it evaporates, leaving extracted pseudoephedrine. Next, the extracted pseudoephedrine is mixed with iodine (a poison), red phosphorus (a flammable solid) or hydriodic acid, which are oxidizers, to take the oxygen away and start converting the mix to methamphetamine, adding distilled water as a liquid and venting the mix through a filter such as kitty litter. Then, the resulting mix is cooked for a significant amount of time, depending on how much is being made, and the mix is filtered again to remove the red phosphorous if it is used, because it does not dissolve. Next, the remaining liquid-called reaction mass liquid-is as acidic as battery acid, a pH of 1, which must be raised by either adding a lot of water or adding lye, with a pH of 14, to result in a mixture around 8 or 9 on the pH scale. Then, an organic solvent-a petroleum-based distillate such as Coleman fuel, charcoal lighter fluid or Freon-is added so that the majority of the methamphetamine goes from the basic layer into the organic layer. Then, the liquid form is turned into a powder, typically by creating hydrogen chloride gas using muriatic acid and aluminum foil, which is directed into the liquid to solidify the methamphetamine, which is filtered out and dried. In an additional step, acetone is added to wash the dried methamphetamine.
Investigator Salisbury also testified that the residue liquid or "waste," such as Coleman fuel, can be saved because it contains leftover dissolved methamphetamine that has not been recovered. The waste is sometimes re-gassed, or is heated to evaporate it off and recover the residue methamphetamine left behind. Another alternative is to use a "shaker jar" method in which an acid is slowly dropped into the waste liquid to convert the methamphetamine into a solid.
Investigator Salisbury further testified that "the chances of having a lab fire and explosion at any site is 1 in 5." He also testified that "the most common cause of meth lab explosions from a solvent is either from the initial extraction phase or the later, the solvent out phase where you actually heat up a solvent."[13]
*685 *953 This detailed evidence, presented first in the James case, which we reviewed on appeal in 1998, and again in the instant case, ineluctably leads to the conclusion that manufacturing methamphetamine in an unprofessional laboratory is inherently dangerous to human life.[14] The trial court *686 here came *954 to that precise determination. After the People rested at trial, and before petitioner put on his case and testified, the trial court recessed and discussed the exhibits presented. Defense counsel lodged a section 1118.1 motion for entry of judgment of acquittal for insufficient evidence, which the trial court denied. The judge stated, "I think as to Count 1 there's sufficient evidence both on straight implied malice theory without the second-degree felony murder, that is if 1 in 5 labs blow up or fire results and you're heating volatile solvents, I think that's inherently dangerous. That's perhaps not quite as dramatic as playing Russian roulette, but it's just like playing Russian roulette. And under those circumstances that would support second-degree murder, and the James case out of our county supports it. I would deny it on both bases."
The trial court was correct in relying on James for a determination of inherent dangerousness to human life. As we observed there, "On appeal, we review the trial court's determination independently. Once a published appellate opinion holds a felony is (or is not) inherently dangerous, that precedent is controlling, unless and until a litigant makes an offer of proof that technological changes have changed the status of the felony. This ensures that the classification of felonies as inherently dangerous is governed by a uniform rule of law. (See People v. Taylor , supra , 6 Cal.App.4th at p. 1092 [8 Cal.Rptr.2d 439].)" ( James , supra , 62 Cal.App.4th at p. 263, 74 Cal.Rptr.2d 7.)[15] Furthermore, James provides defendants with notice of their exposure to a murder conviction, satisfying due process.[16]
*955 As we discuss next, this real-world evidence-based determination is unlike the categorical approach in Johnson .
D. Johnson 's Finding of Unconstitutionally Vague is not Implicated Here
In this case, and in the predecessor James case dealing with manufacturing methamphetamine as an inherently dangerous to human life felony, it was established with scientific precision that such manufacture and its various permutations are in fact inherently dangerous for the purpose of the second degree felony-murder *687 rule. No mere categorical approach was involved, limited to either analyzing elements of an unenumerated felony in a vacuum or hypothesizing a generic felony and how it was carried out. The process used in the trial courts' determinations was not limited to that in Johnson nor the four predecessor ACCA analysis cases the United States Supreme Court considered. Those cases were James v. United States (2007) 550 U.S. 192, 127 S.Ct. 1586, 167 L.Ed.2d 532 ; Begay v. United States (2008) 553 U.S. 137, 128 S.Ct. 1581, 170 L.Ed.2d 490 ; Chambers v. United States (2009) 555 U.S. 122, 129 S.Ct. 687, 172 L.Ed.2d 484 ; and Sykes v. United States (2011) 564 U.S. 1, 131 S.Ct. 2267, 180 L.Ed.2d 60. (See Johnson , supra , --- U.S. ----, 135 S.Ct. at pp. 2558-2559 [comparing predecessor cases].) We are mindful that in prefacing its discussion of these cases, the United States Supreme Court wondered, "How does one go about deciding what kind of conduct the 'ordinary case' of a crime involves? 'A statistical analysis of the state reporter? A survey? Expert evidence? Google? Gut instinct?' [Citation.]" ( Id . at p. 2557.) None of these four cases embodied the approach here of expert witness testimony taken as to the dangerousness of a scientific process, even leaving aside any structural differences between California's former second degree felony-murder rule and the analyses in Johnson and Dimaya .
In James , Chambers , and Sykes , the Court concentrated on the level of risk posed by the crime in question, focusing on comparison to the closest analog among the enumerated offenses in the ACCA in James ; and on statistics in Chambers and Sykes . ( *956 Johnson , supra , --- U.S. ----, 135 S.Ct. at pp. 2558-2559.) In Begay , the Court considered whether drunk driving resembled the enumerated offenses in kind as well as in degree of risk. ( Johnson , --- U.S. ----, 135 S.Ct. at p. 2559.) Ultimately, finding those approaches evidence of the ACCA residual clause's indeterminacy, the Court found that imposing an increased sentence under the residual clause violates due process due to vagueness. ( Id. at p. 2563.)[17] *688 The approach taken here, and in our predecessor James case, is evidence-based on the specific steps used to manufacture methamphetamine and its objective, inherent dangerousness. It is different in nature and in kind from the categorical approach the United States Supreme Court found unconstitutional in Johnson . In fact, the Court noted that, "we do not doubt the constitutionality of laws that call for the application of a qualitative standard such as 'substantial risk' to real-world conduct; 'the law is full of *957 instances where a man's fate depends on his estimating rightly ... some matter of degree.' " ( Johnson , supra , --- U.S. ----, 135 S.Ct. at p. 2561, quoting Nash v. United States (1913) 229 U.S. 373, 377, 33 S.Ct. 780, 57 L.Ed. 1232.) Here, the trial court did precisely that: considered the qualitative standard of "inherently dangerous to human life" to the real-world conduct established by concrete, well-documented scientific expert evidence of the known methods of manufacturing methamphetamine (including "pulling" methamphetamine from its dissolved state in a solvent, specifically including Coleman fuel) and the detailed direct observations and forensic reconstructions of meth lab fires to unavoidably arrive at the determination that manufacturing methamphetamine qualified as an inherently dangerous felony for the purposes of the second degree felony-murder rule.[18] *689 *958 This goes well beyond the "categorical approach" of Johnson and falls outside any of the four predecessor ACCA cases in which the Supreme Court considered "ordinary cases" of the respective charged crimes and speculated as to how the crimes were committed and whether that means of commission constituted a "violent felony" for the ACCA. Here, while not considering the actual facts of petitioner's *690 conduct on October 25, 2000, the superior court had the benefit of a precedential determination in James and heard additional expert testimony as well, as contemplated in James , including on the necessary processes used in the closely related but shorter manufacturing form of "pulling" dissolved methamphetamine from Coleman fuel. Notably, that "shorter" process is merely a form of a process also described in scientific detail, including with alternative methods, in the expert testimony adduced in James . Leaving scant room for doubt or error, it established that the overall process of manufacturing methamphetamine and the shorter subprocess of "pulling" methamphetamine from saturated, leftover residue *959 Coleman fuel is inherently dangerous to human life. In fact, expert testimony adduced in petitioner's trial also established that fires result in about one out of every five attempts to produce methamphetamine, a condition that certainly exceeds the threshold for inherent dangerousness, and that the most common reason for a fire or explosion involves heating a solvent, such as Coleman fuel. This foundation of expert testimony and evidence of real-world scientific processes provides a factual basis, not a hypothesized, categorical or abstract one, for a determination of inherent dangerousness to human life in the felonious manufacture of methamphetamine. That avoids the compounded indeterminacy the United States Supreme Court found violative of due process. ( Johnson , supra , --- U.S. ----, 135 S.Ct. at p. 2558.)
Accordingly, we must be "guided by the familiar principle ... that 'we do not reach constitutional questions unless absolutely required to do so to dispose the matter before us.' [Citation.]" ( Facebook , Inc. v. Superior Court (2018) 4 Cal.5th 1245, 1275, fn. 31, 233 Cal.Rptr.3d 77, 417 P.3d 725.) The due process faults the United States Supreme Court found in categorical analysis of the ACCA's residual clause with regard to prior felonies for the purpose of penalty enhancement are not implicated here, on this record.
III
CONCLUSION
We have considered petitioner's arguments, bolstered as they are by Professor Lee's article, and the countervailing ones respondent has offered, in the light of our Supreme Court's direction to consider "why petitioner is not entitled to a reversal of his second degree felony murder conviction because the reasoning set forth in Johnson [ ] renders the California second-degree murder rule unconstitutionally vague." Necessarily, that consideration has been in the light of the record of petitioner's case and the relevant authorities discussed herein. Given that record, we cannot find that he is entitled to a reversal of his conviction under Johnson .
Accordingly, there is no basis for issuing a writ of habeas corpus.
IV
DISPOSITION
The petition for writ of habeas corpus is denied.
I concur:
RAMIREZ, P. J.

All further citations are to the Penal Code, unless otherwise indicated.

After briefing was complete, this court issued a tentative opinion preparatory to oral argument. The tentative opinion was based on the law existing at the time of petitioner's offense and trial. We became aware that effective January 1, 2019, after the tentative opinion issued but before oral argument, Senate Bill 1437 (2017-2018 Reg. Sess.) (SB 1437) amended sections 188 and 189 and created new section 1170.95. The amendments to sections 188 and 189 together change the felony murder rules and the "natural and probable consequences theory" when convicting a participant in a felony for murder, but who did not actually kill the victim. Of interest here, effective January 1, 2019, the second degree felony-murder rule in California is eliminated. However, the change does not automatically apply to convictions that are final before the effective date, like petitioner's. Instead, section 1170.95 establishes a procedure for such defendants to apply to the sentencing superior court to have their murder conviction vacated and be resentenced on any remaining counts, where certain conditions are met. (§ 1170.95, subd. (a)(1)-(3).) In light of these amendments, the Attorney General filed a letter brief here on January 30, 2019, the week before oral argument, formally providing notice to the court and counsel of the changes. At oral argument on February 5, 2019, counsel for petitioner stated that petitioner had not yet petitioned for relief under SB 1437 but would do so within 14 days. The Attorney General pointed out that until petitioner obtains relief, if he does, he is still subject to the second degree felony-murder conviction; if relief is denied, he remains subject to the conviction and the pre-SB 1437 law. Further, the Attorney General represented that the SB 1437 petition process in superior court is just beginning and that early experience is that the process may take months to complete. Counsel for petitioner did not contradict the time issue. We accept it, arguendo, at face value. Additionally, we are still subject to our Supreme Court's show-cause order on petitioner's challenge under Johnson , discussed post . It is worth mentioning that SB 1437 does not address either Johnson or its constitutional vagueness analysis. In other words, this issue is not moot. Accordingly, we will not hold this decision in abeyance but deny the petition on the merits as discussed herein. Finally, after oral argument and while our opinion was circulating for comment, Division 8 of the Second District Court of Appeal issued its opinion in People v. Frandsen (Apr. 4, 2019, B280329) 33 Cal.App.5th 1126, 245 Cal.Rptr.3d 658, 2019 WL 1486863, 2019 Cal.App. LEXIS 309 (Frandsen ), in which that court found that California's second degree felony-murder rule is not unconstitutionally vague under Johnson . (Frandsen , at pp. 1142, 1150-51, 245 Cal.Rptr.3d 658, 2019 WL 1486863, at *9-10-*15.) As described herein, our decision need not reach that ultimate constitutional issue and we offer no opinion as to Frandsen .

The factual background is taken in part from our opinion on petitioner's direct appeal from conviction (People v. White (July 12, 2005, E034877) 2005 WL 1625015 [nonpub. opn.] (White ) ), and from the record of petitioner's trial. We take judicial notice of the record in E034877 and trial proceedings in case No. RIF94362. (Evid. Code, § 452, subd. (d).)

Commonly used for camping, Coleman fuel is a petroleum-based solvent that is highly flammable. Its use in manufacturing methamphetamine is discussed post .

Probably intended to read, "California second-degree felony murder rule[.]"

Now, Evan Tsen Lee, Why California's Second-Degree Felony-Murder Rule is Void for Vagueness (2015) 43 Hastings Const. L.Q. 1 (hereafter, Lee).

The petition (written in pro. per.) included a single-page claim that Johnson applies. Petitioner, still acting in pro. per., expanded his argument in his reply to respondent's informal response filed in the Supreme Court. The claim is fleshed out by counsel for the first time in the traverse, relying in part on the Lee article. Petitioner's other claim in Supreme Court case No. S233265 is not included in the Supreme Court's order to show cause, and we do not address it here.

Specifically, the version of section 189 in effect at the time of petitioner's offense stated in pertinent part, "All murder which is perpetrated by means of ... is murder of the first degree. All other kinds of murders are of the second degree."

The dissent considers the distinction between prior convictions, for the purpose of sentence enhancements under the ACCA, and current convictions with the dynamics of ongoing trials as "meaningless to a categorical inquiry." (Dis. opn. post , at p. 700.) In section II.D., post , we point out how the use of expert testimony at trial in cases such as this distinguish this process from the categorical inquiry used in Johnson .

We also agree with the dissent that the more recent U.S. Supreme Court review in Dimaya , supra , --- U.S. ----, 138 S.Ct. 1204, finds it unnecessary to assess unenumerated residual clause crimes in the light of enumerated crimes. That is because Dimaya assesses the INA's reliance on the residual clause definition of " 'crime of violence' " in 18 U.S.C.S. section 16, which does not enumerate any specific crimes. (See discussion, ante .) That does not change our point that the ACCA and the INA each respectively define a single term between their elements clauses and residual clauses (with or without enumerated crimes)-either a "violent felony" (ACCA) or a "crime of violence" (INA). Both do so to analyze prior convictions for the purpose of effectuating either the ACCA or the INA. California Penal Code section 189 on the other hand, defines two separate crimes-first degree and second degree murder, from which the felony murder rules arise, for the purpose of structuring a trial (or plea, or dismissal) with the attendant admission of evidence, argument, and jury deliberation to arrive at a current conviction that is its own end. While those portions of the ACCA and the INA may be structurally similar, section 189 is not.

The dissent questions how an ordinary person could be expected to know, or have notice, that an offense had a "high probability" of death in this case if the answer "was not knowable by the Supreme Court" (Dis. opn. post , at p. 695) and had to be remanded. Yet, as discussed immediately post , matters are routinely remanded to the superior court for evidentiary hearings. The point here is that California's approach, established in part by our Supreme Court in Patterson , includes considering evidence on the issue of inherent dangerousness in appropriate cases.

People v. Kelly (1976) 17 Cal.3d 24, 130 Cal.Rptr. 144, 549 P.2d 1240 ; Frye v. United States (D.C. Cir. 1923) 293 F. 1013.

The dissent also suggests that technological advances might develop a way to make methamphetamine manufacturing less dangerous to human life, invalidating the second degree felony-murder rule under Howard . Yet, there are many obsolete laws and legal maxims that fell by the wayside due to technological evolution. (See, e.g., Ruddell and Decker, Train Robbery: A Retrospective Look at an Obsolete Crime (2017) 42 Crim. Just. Rev. 333, 2 [check kiting as a type of bank fraud less frequent today due to advances in electronic benefit transfers (EBT) and debit cards].) That still did not invalidate a conviction for the law violated at the time of commission. In the case of methamphetamine manufacturing, we could consider a method of production more prevalent today than at the time of petitioner's fatal fire, though not universal. The newer method is called "shake and bake" or "one pot" methamphetamine laboratories. "Generally, these laboratories are small-scale, easy to conceal, and produce two ounces or less of methamphetamine per batch. The ingredients, which are common household items (e.g. pseudoephedrine /ephedrine tablets, lithium batteries, camp fuel, starting fluid, cold packs, and drain cleaner), are mixed in a container, such as a plastic soda bottle. This provides a portable method of producing small amounts of methamphetamine. 'One-pot' laboratories are extremely dangerous , and , in many cases , cause fires , which can lead to injury and death ." (Drug Enforcement Admin., U.S. Dept. of Justice, 2017 National Drug Threat Assessment (Oct. 2017) pp. 74-75, italics added.) Thus, the ingredients remain hazardous: lithium scavenged from batteries, volatile liquids, and caustic lye, subject to fires and explosions when mixed. Absent actual evidence to the contrary, we do not see this particular technological "advance" as an improvement to the dangerousness to human life inherent in methamphetamine manufacturing.

The dissent asks us to consider the impact on inherent dangerousness by manufacturing methamphetamine in a more professional setting. To that end, he suggests that manufacturing (1) in a well-ventilated and equipped laboratory or (2) by a Ph.D. in chemistry could demonstrate that it is possible to manufacture methamphetamine safely, citing Howard . He offers in support a 2005 article titled SDSU grad indicted on charges he used campus lab to make drugs , and a 2008 article titled, Ex-Ph.D student makes a deal in meth, theft case , involving a University of California at Merced doctoral student. (Dis. opn. post , at p. 696, fns. 3, 4.) The first article alleged a San Diego State University graduate "used a campus laboratory to manufacture methamphetamine, Ecstasy and other drugs," and that additional Ecstasy and fentanyl were recovered at his residence. The article presents no information from which to infer that the campus environment was any "safer" a venue to manufacture methamphetamine. (See The San Diego Union-Tribune, SDSU grad indicted on charges he used campus lab to make drugs (June 30, 2005) http://www.sandiegouniontribune.com/sdut-sdsu-grad-indicted-on-charges-he-used-campus-lab-2005jun30-story.html [as of April 25, 2019].) Similarly, the doctoral student in Merced was charged with "felony conspiracy to make meth[amphetamine] and embezzlement" for allegedly stealing "$ 10,000 in chemicals and equipment from the school" to manufacture methamphetamine. Again, the article reveals nothing from which to infer that the student was "safely" producing methamphetamine. In fact, the investigation led to his and other residences where "several thousand dollars worth of glass flasks, vessels, pumps and other equipment, as well as chemicals used in the production of meth" was found. (See The Modesto Bee, Ex-Ph.D student makes a deal in meth , theft case (Sept. 27, 2018) < https://www.modbee.com/news/local/crime/article3114437.html> [as of April 25, 2019].) Storing chemicals in residences does not seem particularly any safer, despite the student's doctoral candidacy. The dissent also asks whether the outcome would be different if manufacturing took place in an isolated location, and "Does the law change if, in the next case, the defendant is not someone like Gregory White but instead like Walter White?" (Dis. opn. post , at p. 697 and fn. 5 [citing a Wikipedia entry for the fictional Walter White of the "Breaking Bad" television show]. (See Walter White (Breaking Bad )-Wikipedia, The Free Encyclopedia < https://en.wikipedia.org/wiki/Walter_White_(Breaking_Bad)> [as of April 25, 2019] ).) The comparison to a fictional character is compromised when one realizes that the producers of that series had an interest in ensuring the protagonist-meth-cooking Walter-returned after each episode instead of perhaps perishing in a fire or explosion or from toxic fumes. Further, while we are reluctant to rely on a Wikipedia article (see Crispin v. Christian Audigier , Inc. (C.D. Cal. 2010) 717 F.Supp.2d 965, 976, fn. 19 [collecting cases on the unreliability of a "user-generated source" as a legal reference]; Gerritsen v. Warner Bros. Entertainment Inc. (C.D. Cal. 2015) 112 F.Supp.3d 1011, 1028 ; People v. Stamps (2016) 3 Cal.App.5th 988, 997, 207 Cal.Rptr.3d 828 [Wikipedia considered as hearsay] ), we would point out that the article's abstract of five seasons of the Breaking Bad series indicates several deaths occurred during the fictional Walter's enterprise, if apparently intentional. For example, the article states that in the first season, Walter begins a "cook," only to produce phosphine gas. Phosphine gas is a toxic byproduct of methamphetamine manufacturing that was used as a nerve agent in World War I. (See People v. Odom (1991) 226 Cal.App.3d 1028, 1034, 277 Cal.Rptr. 265.) Walter then used the gas to kill one antagonist and incapacitate another, only to garotte him later. Notwithstanding dramatic plot twists, manufacturing in an isolated location is not dispositive of safety, and if an accomplice or other person is killed during the process, exposure to murder charges exists regardless of location. Of course, if no one else is present, there can be no killing for purposes of the second degree felony-murder rule and the issue is moot.

The instant issue is presented to us as a petition for writ of habeas corpus, not on appeal, but we find no principled reason to treat the precedent established in James any differently.

The dissent expresses concern over due process notice from diverse decisions under the former second degree felony-murder rule. Again, our decision here is based on the record of this case. First, former Sheriff's Deputy James testified at petitioner's trial that in 1996, four years before Rhea's death, "[h]e specifically told [petitioner] about a 1995 incident involving Kathy [sic ] James. While Kathy James was manufacturing methamphetamine, an explosion occurred that resulted in the death of three of her children. (See People v. [Kathey Lynn ] James (1998) 62 Cal.App.4th 244, 250, 74 Cal.Rptr.2d 7.) In response, defendant told [Deputy] James that he was aware of the Kathy James case and of the dangers of manufacturing methamphetamine." (White , supra , E034877, at pp. 32-33.) Petitioner also testified at his trial and, "[o]n cross-examination, [he] admitted that he had extensive knowledge of the different methods of manufacturing methamphetamine, had been manufacturing the drug for at least 10 years before October 2000, and knew about the dangers of manufacturing methamphetamine." (Id . at p. 15.) There is no question on this record that petitioner had not only constructive notice but actual notice that death of another during the felonious manufacture of methamphetamine carries exposure to a murder conviction, or that manufacturing methamphetamine is inherently dangerous to human life.

As we noted in section I above, petitioner filed a post-traverse letter pointing out the U.S. Supreme Court's most recent opinion on this issue in Dimaya , supra , --- U.S. ----, 138 S.Ct. 1204, and asserting that "[t]he decision is relevant to arguments in White's traverse," but not explaining how that is so. Dimaya does not add to petitioner's argument in this case.
Petitioner filed a second letter pointing out the Ninth Circuit's recent opinion in Henry , supra , 899 F.3d 703, also asserting it relevant to arguments in his traverse. There, the Ninth Circuit considered the request of a California state inmate to file a second or subsequent federal habeas petition pursuant to 28 U.S.C. section 2254, the applicable section of the federal Antiterrorism and Effective Death Penalty Act (AEDPA), and whether that petitioner satisfied the requirements of 28 U.S.C. section 2244(b) to do so. (Henry , at p. 705.) The inmate had been convicted of felony discharge of a firearm at an inhabited dwelling and second degree murder in 1996. (Ibid . ) Because he had previously filed a federal habeas petition under 28 U.S.C. section 2254, he was required to obtain the court of appeals' authorization for the federal district court to consider his successive petition. (Henry , at p. 705 ; 28 U.S.C, § 2241(b)(3)(A).) He requested the second or successive petition to argue that Johnson applied to California's second degree felony-murder rule, and that the rule was made void for vagueness thereby. (Henry , at p. 707.) The Ninth Circuit found the petitioner made a prima facie showing that his proposed petition relied on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable, and overcame the State's objections. (Id . at pp. 707-711.) The Ninth Circuit discussed both the Johnson analysis of the ACCA's residual clause and California's second degree felony-murder rule, comparing certain similarities and differences between them, but limited its determination to the request for a successive petition. The Ninth Circuit granted that authorization for a second or subsequent federal habeas petition under the AEDPA, while noting that the demanding standard of 28 U.S.C. section 2254 may cause the petition to ultimately fail "for any number of reasons" not then before that court. (Id . at p. 711.) As such, the case involves a procedural determination under the terms of the AEDPA, not a substantive consideration of the Johnson second degree felony-murder rule issue raised by petitioner herein. To the extent that the Ninth Circuit found that the argument as to unconstitutionality in Henry was "plausible," as the dissent points out, we read it simply in the context of overcoming the AEDPA's bar to a successive federal habeas petition. We further note that Henry does not involve the factual and evidentiary considerations, i.e., expert witness testimony as to a scientific process obviating the vagueness issue in Johnson , that is central here. Petitioner does not otherwise articulate how Henry is relevant, and it does not avail him.

The dissent also suggests that there is no guidance how to determine the likelihood of death from the manufacture of methamphetamine. In one attempt, however, the dissent cites a study by the Centers for Disease Control and Prevention, Injuries from Methamphetamine Related Chemical Incidents-Five States , 2001-2012 . (Dis. opn. post , at p. 698 and fn. 6.) That study reviewed 1,325 reports of methamphetamine chemical-related incidents, finding that in 87 of them (seven percent), 162 persons were injured with two deaths. The dissent, admitting that the five states involved (Louisiana, Oregon, Utah, New York, and Wisconsin) did not include California, still questions whether these statistics should constitute a " 'high probability' " of death for purposes of the second degree felony murder rule. (Dis. opn. post , at pp. 698-99.) The study itself, however, admits its limitations in this regard. "First, all meth-related incidents for the five states in the database might not have been captured because of the queries used. NTSIP does not include meth incidents in homes unless there is a public health action, such as evacuation. In addition, because of pending legal actions, data on meth-chemical incidents are often difficult to obtain. Second, because states rely on relationships with law enforcement agencies and on scanning media reports, the quality of meth-related chemical incident data differs among states. Finally, trends from the five states cannot be generalized to the entire United States." (Natalia Melnikova et al., Injuries from Methamphetamine-Related Chemical Incidents-Five States , 2001-2012 (Aug. 28, 2015), at p. 3 < https://www.cdc.gov/mmwr/preview/mmwrhtml/mm6433a4.htm> [as of April 25, 2019].) These limitations make the data in the CDC's study questionable. For one example, the "pending legal actions" making data difficult to obtain could easily mean that deaths are not consistently reported. Aside from this study, the dissent considers whether expert testimony in the instant case and in James sufficiently establishes a "high probability" of death. The dissent refers to sheriff's investigator Salisbury's experience-based testimony that "the chances of having a lab fire and explosion at any site is 1 in 5" as "weakly sourced." (Dis. opn. post , at p. 698.) However, Investigator Salisbury attributed the one in five statistic to data compiled by the national organization of the Clandestine Laboratory Investigators Association, from whom he also testified he received part of his formal training. The dissent does not explain how this expert witness testimony is "weakly sourced" on this background. We find Salisbury's testimony supported by substantial evidence and simply observe that " 'the reviewing court must "accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if supported by substantial evidence." ' " (People v. Tully (2012) 54 Cal.4th 952, 990, 145 Cal.Rptr.3d 146, 282 P.3d 173 [quoting People v. Gonzalez (2005) 34 Cal.4th 1111, 1125, 23 Cal.Rptr.3d 295, 104 P.3d 98 ].) Notwithstanding, the dissent relies on two other investigators' experience-based assessments that methamphetamine manufacture can be done " ' "relatively" safely' " and that " '[s]ome "cookers" have produced thousands of batches without an explosion[.]' " (Dis. opn. post , at p. 703.) The dissent thus reasons that, under Howard , " 'in the abstract, manufacturing methamphetamine is not inherently dangerous.' " (Ibid .) Yet, in James , the source of these two investigators' testimony, defendant Kathey Lynn James testified that she manufactured methamphetamine " 'in the safest way as possible' ..., '[o]ne step at a time, which made it a lot more safe and clean' ..., 'avoid[ed] adding any heat to the process, although, when she needed to, she used a lukewarm heating plate,' " and hired two others "to take care of her children so they would not be around when she was 'cooking.' " (James , supra , 62 Cal.App.4th at p. 256, 74 Cal.Rptr.2d 7.) She testified she had " 'cooked' " 300 batches of methamphetamine without an explosion or fire. (Id . at p. 255, 74 Cal.Rptr.2d 7.) Notwithstanding this supposedly "safe" method of manufacture, she had a methamphetamine-related fire that killed three of her children, regardless of how many batches she had made over any amount of time. She was convicted of second degree murder and second degree felony murder on all three deaths; manufacturing methamphetamine; and, conspiracy to manufacture. (Id . at p. 250, 74 Cal.Rptr.2d 7.) As we said in our review in James , " 'In viewing the elements our task is not to determine if it is possible (i.e., "conceivable") to violate the statute without great danger. ... Rather the question is: does a violation of the statute involve a high probability of death?' " (James , at p. 270, 74 Cal.Rptr.2d 7 ; Morse , supra , 2 Cal.App.4th at p. 646, 3 Cal.Rptr.2d 343.) The outcome in James is illustrative. Additionally, still in James , Gloria Pingrey, special agent of the California Department of Justice, had investigated 50 methamphetamine labs. Two fires had resulted in deaths; in two other cases, toxic fumes had caused death. (James , at p. 264, 74 Cal.Rptr.2d 7.) Another special agent of the California Department of Justice, Ken Riding (one of the investigators on whom the dissent relies), testified that despite any ability to manufacture " 'in a relatively safe way,' " using acetone and Coleman fuel is dangerous because they can be ignited by a hot plate or an open flame and he "knew of 'several' deaths from methamphetamine lab explosions." (Ibid . ) Returning to the instant case, obviously, a death occurred: Brian Keith Rhea, petitioner White's friend and accomplice. Together with the expert testimony of the process of methamphetamine manufacturing, that is sufficiently precise to inform our decision of inherent dangerousness here. (We have already observed that the trial court in petitioner's case analogized the one in five chances of a fire or explosion to playing Russian roulette-placing a live round in one chamber of a five-chamber revolver, spinning the cylinder, placing the revolver's barrel to the head, and pulling the trigger. After a trigger pull, the hammer may fall on an empty chamber, making that a "relatively safe" result. Luck or poor gun skills might also result in a wound instead of a fatality when a round goes off-a "conceivable" relatively safe outcome. Yet, we find nothing to suggest that playing Russian roulette is other than "inherently dangerous to human life.")