Filed 7/1/22 P. v. Willis CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | C092150 |
| Plaintiff and Respondent, | (Super. Ct. Nos. STK-CR-FE-1992-0008138, SC054778A) |
| v. | |
| CHRISTIAN ENRIQUE WILLIS, | |
| Defendant and Appellant. | |

This appeal from the denial of defendant Christian Enrique Willis's Penal Code section 1170.95[1] petition addresses a murder committed in 1992. On the evening of October 6, 1992, and early morning hours of October 7, 1992, defendant, along with Payton Erbaugh, and Daniel Rontal, committed three separate armed robberies; the victim of the second robbery was shot and killed by Erbaugh with a gun supplied by

---

[1]     Undesignated statutory references are to the Penal Code.

1

defendant. Defendant was convicted of murder with a robbery special circumstance (§§ 187, 190.2, subd. (a)(17)(A)); three counts of robbery (§ 211); felony evading an officer (Veh. Code, § 2800.2); felon in possession of a firearm (former § 12021, subd. (a)); and, along with personal use of a firearm (§ 12022.5, subd. (a)), being armed with a firearm (§ 12022, subd. (a)(1)) and serious felony (§ 667, subd. (a)) enhancements. The trial court sentenced defendant to life without the possibility of parole plus 17 years.

On direct appeal, we modified the first degree murder conviction to second degree murder and struck the special circumstance finding because the verdict form failed to specify the degree of murder. We accordingly modified the sentence for the murder count to 15 years to life, to be served consecutively to the 17-year determinate term.

Defendant filed a section 1170.95 petition on January 7, 2019. The trial court found defendant's petition made a prima facie case for relief, but subsequently denied the petition following a hearing.

On appeal, defendant contends the trial court improperly acted as an independent fact finder when determining eligibility for relief, he did not act with reckless indifference to life and was not a major participant in the robbery underlying the murder, and our striking of the robbery special circumstance and reversal of the first degree murder conviction preclude a finding of ineligibility based on felony murder. Defendant further avers in his first supplemental brief that he is entitled to automatic resentencing because the trial court implicitly found that he was not a major participant who acted with reckless indifference to human life when it struck the jury's special circumstance finding. In his second supplemental brief, defendant argues that the trial court erroneously relied on the factual history recited in our prior appellate opinion, as Senate Bill No. 775 (2021-2022 Reg. Sess.) (Senate Bill 775) amended section 1170.95 to clarify that at a hearing on the petition, the trial court may rely upon the *procedural*, but not the *factual*, recitation in a prior appellate opinion.

2

We conclude that the trial court applied the correct legal standard in deciding the petition, finding beyond a reasonable doubt that defendant was guilty of felony murder, as a major participant who acted with reckless indifference to human life, under the law as it currently stands. As this finding is supported by substantial evidence, and our prior modification of the conviction does not preclude relying on a theory of felony murder in finding defendant ineligible for relief, nor does it entitle defendant to automatic resentencing, we shall affirm.[2]

FACTUAL AND PROCEDURAL BACKGROUND

We take the facts of defendant's crimes from our unpublished opinion affirming his conviction. (See *People v. Lewis* (2021) 11 Cal.5th 952, 972 [appellate opinion generally part of record of conviction as applied to section 1170.95 proceedings] (*Lewis*).) We rely on the record of his prior appeal for necessary procedural facts. (§ 1170.95, subd. (d)(3).)

"The Robbery of Eugene Mannie

"On October 6, 1992, Daniel Rontal, who testified on behalf of the prosecution as part of a plea agreement, spent some time drinking and driving around with Willis in Willis's gray 1983 Pontiac Grand Prix. Later that evening they picked up Willis's girlfriend, Juanita Bravo, from work. Bravo was carrying a .22-caliber revolver in her purse and gave it to Willis, who put the gun under the driver's seat. After driving Bravo to the home he shared with her, Willis left with Rontal. According to Bravo, Willis was wearing black pants, a white T-shirt and a hair net.

"Willis and Rontal discussed going to nearby Oak Park to harass or rob some of the gay men who congregated there, and on the way to Oak Park they picked up Erbaugh. The three men walked to Oak Park after leaving Willis's car at a nearby AM/PM

---

[2] This matter was reassigned to the panel as presently constituted in May 2022.

convenience store. When they arrived at the park, Willis and Erbaugh walked over to a station wagon.

"Around 9:20 p.m., Eugene Mannie was driving a station wagon in the area of Oak Park when he stopped to 'relieve [him]self' and have a cigarette. As he got into his car to leave, he was approached by a black man wearing dark pants, a light T-shirt and a hair net, and a white man, whom Mannie later identified as Erbaugh, wearing pink or red pants and a light-colored shirt. The black man pointed a revolver at Mannie, threatened to shoot him, and ordered him to get out of the car. As Erbaugh stood by, the black man forced Mannie to the ground, demanded money and rifled through his pockets. Mannie heard his car engine start and the black man, whom Rontal identified as Willis, got into the car and drove away rapidly.

"Willis and Erbaugh stopped to pick up Rontal before leaving Oak Park. Willis drove the station wagon to the AM/PM where his car was parked, and he and Erbaugh got out, agreeing to meet Rontal later at the Green Frog liquor store. Rontal drove Mannie's car to the Green Frog. When Willis and Erbaugh arrived, either Willis or Erbaugh stated he had shot at someone who was following them.

"Franco Amonini observed Mannie being robbed and saw the two robbers drive off and stop to pick up a third person, who appeared to be Mexican. Amonini came to Mannie's assistance and took him to the AM/PM to telephone the police. While Mannie was on the telephone, he saw Erbaugh walk across the parking lot and get into what appeared to be a two-door, 'green-gold Oldsmobile Buick Regal,' and drive away. Mannie asked Amonini to try to get the license number, and Amonini drove off in pursuit of the vehicle, which he described as a grayish, two-door American car. Shortly thereafter, Amonini abandoned the chase when Erbaugh began shooting at him. A subsequent examination of Amonini's car revealed three bullet holes, which appeared to have been made by .22-caliber bullets.

4

"The police found Mannie's car around 10:05 that evening. When Mannie retrieved the car from the towing yard the next day, he discovered that several items were missing, including his wallet, credit cards, approximately $400 in cash, a tool box and a spare tire.

"The Robbery and Murder of Bradley Nielsen

"According to Rontal, after they abandoned Mannie's car, Rontal, Willis and Erbaugh continued drinking and 'rolling around.' At some point they picked up Jesse Rodriguez. Rontal dozed off and awakened when the car came to a stop near a dark-colored truck on the Lathrop Road off-ramp of Highway I-5. Rontal stated that everyone except Rodriguez got out of the car and went over to the truck, whereupon Willis opened the truck cab door and handed Erbaugh the gun. Erbaugh climbed inside the cab and Rontal heard three shots fired. Everyone ran back to the Grand Prix, and the four men drove away. Erbaugh removed some money from a wallet and then threw the wallet out the window. Willis drove them to a convenience store and, after Rodriguez purchased beer, they dropped off Rontal at the residence where he was staying.

"Shortly after 1 a.m. on October 7, 1992, Johnny Stafford was en route to Manteca when he noticed an older model 2-door car parked by a truck at the Lathrop Road exit from Highway 5. Stafford stopped at a nearby Quik Stop convenience store to purchase a gallon of milk. According to a surveillance camera videotape and a cash register record from the Quik Stop, Stafford purchased the milk at 1:09 a.m., immediately before Rodriguez made the aforementioned purchase of beer at 1:10 a.m. The videotape also depicted a man resembling Willis outside the store.

"At approximately 1:15 a.m., Maurice Cotton observed a man lying beside a truck, parked off of the Lathrop Road exit. When Cotton noticed blood was trickling from the right side of the man's face, he drove to a nearby store and called 911. Paramedics arrived at 1:19 a.m., but it was too late to help the dead victim, Bradley Nielsen. Nielsen's wrist watch, which was set one hour ahead to Idaho time, was shattered and

showed the time to be 2:04:13 a.m. An autopsy performed on Nielsen's body revealed three separate gunshot wounds: one to the left wrist, one to the left back and one to the left upper neck.

"Erbaugh's fingerprints were found on the exterior of the sleeper door of the truck and on the interior sleeper door latch. Rodriguez's palm and fingerprints were found on the lower right hand corner of the exterior sleeper door. Other latent fingerprints that were insufficient for identification also were lifted from the truck. Nielsen's wallet was found in the bushes near Lathrop Road.

"The Robbery of Efren Llanes

"During the very early morning hours of October 7, 1992, Efren Llanes was driving his light blue Toyota Celica to his brother's home in Stockton. Llanes lost his way and made a wrong turn onto a dead-end street. As he attempted to back up, he was blocked from behind by 'an American car.' A white man, whom Llanes later identified as Erbaugh, pointed a gun at him, ordered him out of the car, and demanded his ring, watch and wallet. A black man, whom Llanes identified as Willis, got into Llanes's Toyota and started the car. Someone drove the American car away, and Erbaugh and Willis followed in Llanes's Toyota. Llanes called the police and reported the robbery.

"At approximately 2:11 a.m., Stockton Police Officer Kenneth Long received a dispatch call reporting a robbery in progress. Long observed a Toyota Celica and a gray Pontiac Grand Prix that appeared to be traveling in tandem. After both cars failed to stop at a stop sign, he began to follow them. When the cars separated, Long pursued the Toyota Celica. After other police units joined the chase, the Toyota turned onto Lynn Road in French Camp and the occupants, who were Willis and Erbaugh, abandoned the vehicle. The officers caught Willis first and a pat-down search disclosed a box of .22-caliber ammunition, some additional loose rounds, and 12 of Eugene Mannie's credit cards. In addition, a twenty-dollar bill with human blood smears on it was found several feet from Willis. The bullets taken from Willis's pocket matched the weight, shape and

6

appearance of the bullets removed from Nielsen's body. Erbaugh was arrested approximately 20 minutes later; his clothing contained smears and spatters of blood of a type consistent with Nielsen's blood.

"Around 3 a.m., Juanita Bravo saw Willis's car parked next door in front of Rodriguez's house. About an hour later, Willis called and told Bravo he was in jail, asked her to get his car keys from Rodriguez, and asked her not to talk with the police. Subsequently, the police towed away Willis's Grand Prix, which had a blood smear on the passenger-side door as well as two smears on the back seat. The smears on the back seat were consistent with Nielsen's blood. A fragment of glass found in the back seat had the same chemical makeup as the glass from Nielsen's watch crystal. Small red fabric pilings found on the back seat of Willis's car matched the red sweat pants that Erbaugh was wearing when he was arrested. A spare tire belonging to Mannie was in the trunk." (*People v. Willis et al.* (Apr. 24, 1996, C017311, C017586) [nonpub. opn.], fn. omitted.)

The jury was instructed on two theories of defendant's liability for murder, felony murder and as an aider and abettor to the robbery under the natural and probable consequences doctrine. It also was instructed that to find true the robbery special circumstance, it had to find defendant was either the actual killer or an aider and abettor who acted with reckless indifference to human life.

After defendant filed the section 1170.95 petition, the trial court issued an order to show cause and appointed counsel for defendant. The People filed a brief asserting defendant was ineligible for relief because he had been a major participant who acted with reckless indifference during the Nielsen robbery murder, based on the trial record and our prior opinion. Defendant filed a brief asserting he was entitled to relief because the prosecutor failed to prove beyond a reasonable doubt that the jury did not rely on the natural and probable consequences theory of liability.

At the hearing on the petition, the trial court took judicial notice of our opinion in defendant's direct appeal and its own file from the original trial. The court noted the

7

People had the burden of proving beyond a reasonable doubt defendant's ineligibility for relief. The court relied on our prior opinion to find various facts true beyond a reasonable doubt. Applying these facts to the factors from *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*), the trial court found that defendant's acts "prove beyond a reasonable doubt" that defendant "was a major participant in the killing of Victim Nielsen" and that defendant acted with reckless indifference to human life. It accordingly denied the petition.

DISCUSSION

I

*Section 1170.95 Eligibility Review*

Defendant contends the trial court erred in acting as an independent fact finder when finding him ineligible for section 1170.95 relief. He claims the proper inquiry when determining eligibility under section 1170.95 is whether the murder verdict is still supported by a valid theory. He asks us to conduct an independent review of the ineligibility finding, and asserts that he is eligible for relief as he was neither a major participant in the underlying felony nor acted with reckless indifference to human life. To address these contentions, we first determine the appropriate standard for assessing eligibility for relief under section 1170.95, then ascertain the appropriate standard for appellate review and, finally, apply that standard to the trial court's ruling.

A.    *Senate Bill No. 1437*

On September 30, 2018, the Governor signed Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Senate Bill 1437). Senate Bill 1437 was enacted to "amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1(f).) Effective

8

January 1, 2019, the legislation amended sections 188 and 189 and added section 1170.95.

Section 188, which defines malice, now provides in part: "Except as stated in subdivision (e) of Section 189, in order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in a crime." (§ 188, subd. (a)(3).) Section 189, subdivision (e) now limits the circumstances under which a person may be convicted of felony murder: "A participant in the perpetration or attempted perpetration of a felony listed in subdivision (a) [defining first degree murder] in which a death occurs is liable for murder only if one of the following is proven: [¶] (1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2." (§ 189, subd. (e).)

The new section 1170.95 permits those convicted of felony murder or murder under the natural and probable consequences doctrine to petition the sentencing court to vacate the conviction and to be resentenced on any remaining counts where: "(1) A complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder, murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime . . . . [¶] (2) The petitioner was convicted of murder . . . following a trial . . . . [¶] (3) The petitioner could not presently be convicted of murder . . . because of changes to Section 188 or 189 made effective January 1, 2019." (§ 1170.95, subd. (a).)

If a petitioner files a facially sufficient petition, the trial court shall appoint counsel, if requested, and determine whether the petitioner has made a prima facie case

9

for relief under section 1170.95, subdivision (c). (*Lewis, supra*, 11 Cal.5th at pp. 961-962.) "If the petitioner makes a prima facie showing that the petitioner is entitled to relief, the court shall issue an order to show cause." (§ 1170.95, subd. (c).) In that event, the court must hold a hearing within 60 days to determine whether to vacate the murder conviction. (§ 1170.95, subd. (d)(1).) At this third and final stage of the proceeding, the prosecution has the burden of proving "beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019." (§ 1170.95, subd. (d)(3).)

B. *The ineligibility standard*

The parties first dispute the proper standard of proof the trial court must apply to determine whether the prosecution has met its burden under section 1170.95, subdivision (d)(3). This question was unsettled at the time of defendant's hearing. Nonetheless, the trial court applied the more stringent standard, finding as an independent fact finder that defendant was guilty of murder under the law as of January 1, 2019, beyond a reasonable doubt.

Moreover, the standard used by the trial court is consistent with Senate Bill 775's amendments to section 1170.95, which went into effect following defendant's hearing. As amended, section 1170.95, subdivision (d)(3) clarifies that "[a]t the hearing to determine whether the petitioner is entitled to relief, the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder . . . under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019. . . . A finding that there is substantial evidence to support a conviction for murder . . . is insufficient to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing." (§ 1170,95, subd. (d)(3).) As the trial court applied this standard of proof at the hearing, the trial court acted properly, consistent with the current statutory language.

10

C.       *Substantial evidence supports the trial court's ruling*

1.       *Standard of review*

Defendant claims we should independently review the trial court's factual findings since it took no additional evidence and made no credibility determinations. We disagree.

It is well established that we review sufficiency of the evidence challenges to judgments of conviction for substantial evidence. (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711 & fn. 3.) The same standard applies to the review of postjudgment orders. (See *People v. Crosswhite* (2002) 101 Cal.App.4th 494, 507-508 [applying substantial evidence review to section 1026.5 orders extending state hospital commitments]; *People v. Sledge* (2017) 7 Cal.App.5th 1089, 1096 [applying substantial evidence review to orders denying resentencing under section 1170.18].)

In the context of section 1170.95 petitions, appellate courts reviewing a trial court's factual findings from an evidentiary hearing also have applied substantial evidence review. (*People v. Ramirez* (2021) 71 Cal.App.5th 970, 985; *People v. Williams* (2020) 57 Cal.App.5th 652, 663; *People v. Bascomb* (2020) 55 Cal.App.5th 1077, 1087). Indeed, in *People v. Clements* (2022) 75 Cal.App.5th 276, the appellate court expressly rejected the argument that we should apply an independent review standard to factual findings the trial court makes from a cold record at a section 1170.95 evidentiary hearing. (*Clements, supra*, at pp. 297-298.) In doing so, it emphasized that the question of whether defendant acted with reckless indifference to human life is a predominantly factual one. (*Id.* at p. 301.) Here, the trial court considered the same question at defendant's hearing.

We agree that the substantial evidence standard of review is the appropriate standard for our review on this appeal. (See also *People v. Perez* (2018) 4 Cal.5th 1055, 1066 ["even if the trial court is bound by and relies solely on the record of conviction to

determine eligibility, [where] the question . . . remains a question of fact, . . . we see no reason to withhold the deference generally afforded to such factual findings"].)

"In assessing a claim of insufficiency of evidence, the reviewing court's task is to review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.]" (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.)

The trial court ruled defendant ineligible because he was guilty of murder under the felony-murder theory of liability. Since defendant was not the actual killer, he can be guilty under a felony-murder theory only if he, "with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree," or he "was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2." (§ 189, subd. (e)(2), (3).)

## 2. *Record of conviction*

Defendant takes issue with the trial court's reliance on the statement of facts in our prior opinion addressing the appeal of his conviction. Admitting the statement of facts in an appellate opinion is part of the record of conviction, at least for determining whether a prima facie case of section 1170.95 eligibility has been established (*Lewis, supra*, 11 Cal.5th at pp. 970-972), defendant asserts it cannot be the complete record for the purposes of determining whether he is ineligible for relief under section 1170.95, subdivision (d)(3). As he properly notes, " '[a]n appellate opinion might not supply all the answers,' and opinions might not 'be relevant to the question' raised in later proceedings." (*People v. Woodell* (1998) 17 Cal.4th 448, 457.) Since the prosecutor's request for judicial notice of the trial record did not attach a copy of that record, as required under California Rules of Court, rule 3.1306(c), he concludes the People failed

12

to carry their burden of proof at the section 1170.95 hearing, and the trial court's factual findings cannot be upheld.

Defendant expands on this argument in a supplemental brief, noting that Senate Bill 775 added language to section 1170.95 which says that at a hearing on the petition, the trial court " 'may also consider the procedural history of the case recited in [any prior] the appellate opinion,' " citing section 1170.95, subdivision (d)(3). Defendant argues that the statute's omission of any reference to the appellate statement of facts suggests that courts may not rely on the factual recitation in a prior opinion to determine whether defendant is eligible for relief. Thus, defendant contends that the trial court here erred by referencing facts from our prior appellate opinion to reach its decision.

While the trial court relied on our prior opinion in its recitation of facts proved beyond a reasonable doubt, it was neither unaware of the trial record nor is there any reason to believe it did not take into account the facts therein when making its ruling. The trial court took judicial notice of the trial record in defendant's case and the parties cited that record during argument at the hearing on the section 1170.95 petition. (§ 1170.95, subd. (d)(3) [at the hearing, the trial court may consider "matters judicially noticed"].) This included references to the prosecutor's closing argument and the verdict forms. Further, the prosecutor relied on the complete trial record when summarizing its argument to the trial court: "I think it's pretty clear based on all of the transcripts we have available in the record of conviction that [defendant] was convicted of murder as a result of the intent to commit the robbery, which is why it falls under that specific category rather than the other two."

Additionally, defendant had the opportunity to present any admissible evidence at the hearing, including any evidence that might call into question the factual summary from our 1996 opinion. Defendant also did not object to the trial court's reliance on the opinion at the hearing. Defendant's failure to timely object to the trial court's recitation of facts from our prior opinion forfeits any claim that the facts therein could not be used

13

to support the trial court's finding that defendant was ineligible for relief. (Evid. Code, § 353, subd. (a); *People v. Demetrulias* (2006) 39 Cal.4th 1, 20-21.)

We conclude the trial court did not ignore any relevant evidence and its reliance on our opinion neither invalidates its ruling nor justifies a less deferential standard of review than substantial evidence.

### 3. *Major participant*

"The ultimate question pertaining to being a major participant is 'whether the defendant's participation "in criminal activities known to carry a grave risk of death" [citation] was sufficiently significant to be considered "major" [citations].[ ]' [Citation.]" (*Clark, supra*, 63 Cal.4th at p. 611.) In answering that question, we consider the totality of the circumstances. Relevant considerations include: " 'What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? What did the defendant do after lethal force was used?' [Citation.]" (*Ibid*.) "No one of these considerations is necessary, nor is any one of them necessarily sufficient." (*Banks, supra*, 61 Cal.4th at p. 803.)

Applying these factors, the trial court found beyond a reasonable doubt that defendant was a major participant in the robbery of the murder victim, Nielsen. In support of this finding, the trial court found defendant played a major role in the robbery, having agreed with the actual killer, Erbaugh, to participate in a series of robberies, one of which resulted in the murder of Nielsen, as well as providing the car used in the robberies and acting as the driver and the leader. The court also found defendant supplied the firearm and bullets used by Erbaugh to murder Nielsen. According to the

14

trial court, defendant "opens the truck door in which Nielsen is sitting and hands the loaded gun to the codefendant, who shoots and kills Nielsen.· All the while, the defendant waits outside the door with more bullets in his pocket." The court also found defendant was aware of the particular dangers posed by the crime, the weapons used, or past experience or conduct of other participants, as a few hours before the Nielsen robbery, defendant saw Erbaugh use the gun defendant gave to him to shoot at Amonini, the witness to the first robbery, against victim Mannie. Furthermore, the court noted that defendant remained with Erbaugh after this, giving him the firearm he used to murder Nielsen. The trial court also found defendant was in a position to facilitate or prevent the murder, as defendant "could have prevented the murder by not handing the gun to the actual killer even though he knew the actual killer had just shot at a witness prior to the robbery." Finally, after the lethal force was used, defendant and his compatriots fled the scene and committed another robbery with the same gun.

Based on the record of conviction in this matter, the court could reasonably find that defendant supplied the firearm used by Erbaugh to shoot at Amonini, the witness to the first robbery, and then kill Nielsen in the second one, that defendant continued to participate in the robberies, drove defendant to the Nielsen robbery, and supplied him with the gun for that robbery and murder even after knowing Erbaugh had used it before to shoot at Amonini. Following the robbery murder, defendant and the other participants fled to commit a third and final armed robbery, again using defendant's gun. These facts in turn support the court's findings regarding the various factors identified in *Clark*. Substantial evidence supports the trial court's finding that defendant was a major participant in Nielsen's robbery.[3]

---

[3] Defendant's claims to the contrary regarding the major participant and reckless indifference factor rely on excerpts of trial testimony to dispute the facts recited in our prior opinion. For example, defendant notes that regarding the Mannie robbery, Mannie

15

### 4. *Reckless indifference to human life*

"Reckless indifference to human life has a subjective and an objective element. [Citation.] As to the subjective element, '[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed,' and he or she must consciously disregard 'the significant risk of death his or her actions create.' [Citations.] As to the objective element, ' "[t]he risk [of death] must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation." ' [Citation.] 'Awareness of no more than the foreseeable risk of death inherent in any [violent felony] is insufficient' to establish reckless indifference to human life; 'only knowingly creating a "grave risk of death" ' satisfies the statutory requirement. [Citation.]" (*In re Scoggins* (2020) 9 Cal.5th 667, 677 (*Scoggins*).)

To determine whether defendant had the requisite mental state, "[w]e analyze the totality of the circumstances" in a manner that largely overlaps with our "major participant" discussion. (*Scoggins, supra*, 9 Cal.5th at p. 677.) The overlap is not

---

saw Erbaugh, not Erbaugh and defendant, walk across the parking lot when he was on the telephone, while Amonini, following Willis's car, did not see anyone other than Erbaugh in Willis's car and was certain it was only Erbaugh firing at him, standing by the car. Defendant argues this undercuts the finding that he knew Erbaugh had fired at Amonini. He also questions the reliability of Rontal's testimony regarding defendant's actions at Nielsen's truck suspect, as Rontal claimed at various points not to have seen Rodriguez get out of the truck even though Rodriguez's fingerprints were on the sleeper door of Nielsen's truck and blood was on his clothing. Defendant also relies on the fact that Rontal told police Erbaugh had a gun but not that defendant handed the gun to Erbaugh.

Defendant does not claim that the facts stated in our prior opinion were factually impossible or wrong, merely that there was conflicting evidence on some points. Section 1170.95 allocates responsibility for resolving such conflicts to the trial court. On appeal, we do not resolve such conflicts, but rather examine the record to see if the trial court's findings are supported by substantial evidence.

16

unusual. As our Supreme Court has explained, " '[a]lthough we state these two requirements separately, they often overlap,' " " 'for the greater the defendant's participation in the felony murder, the more likely that he acted with reckless indifference to human life.' " (*Clark, supra*, 63 Cal.4th at p. 615.) With that in mind, we turn to several considerations our Supreme Court has found particularly relevant in analyzing whether a defendant acted with reckless disregard to human life: "Did the defendant use or know that a gun would be used during the felony? How many weapons were ultimately used? Was the defendant physically present at the crime? Did he or she have the opportunity to restrain the crime or aid the victim? What was the duration of the interaction between the perpetrators of the felony and the victims? What was the defendant's knowledge of his or her confederate's propensity for violence or likelihood of using lethal force? What efforts did the defendant make to minimize the risks of violence during the felony? [Citation.]" (*Scoggins*, at p. 677.)

The factors supporting defendant's major participation likewise support the trial court's finding that he acted with reckless indifference to human life. Defendant provided the gun used to murder Nielsen, and knew the person to whom he gave the weapon, the eventual killer Erbaugh, had fired that gun at Amonini, the witness to their first robbery, against Mannie, a few hours before. Defendant was present at the scene of the crime, and could have prevented Nielsen's robbery and murder by not giving Erbaugh the gun or by not driving them to the robbery in his car. Having seen Erbaugh fire the gun at Amonini, defendant knew Erbaugh had the propensity to use lethal force, and notwithstanding that knowledge, did nothing to minimize the risk of violence during the robbery that took Nielsen's life.

Like the major participant finding, substantial evidence supports the trial court's finding that defendant acted with reckless indifference to human life.

17

## II

### *Prior Modifications of the Conviction*

A.    *Reduction to second degree murder*

Defendant's next contention is that our modification of his conviction to second degree murder in the appeal from his conviction precludes a finding of ineligibility for relief under section 1170.95. According to defendant, since second degree felony murder no longer exists after Senate Bill 1437 (see *In re White* (2019) 34 Cal.App.5th 933, 937, fn. 2 [Senate Bill 1437 abrogated second degree felony murder]; *People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1142, fn. 3 [Senate Bill 1437 "brings into question the ongoing viability of second degree felony murder in California"]), and felony murder is the only potentially available theory of liability under which he could be convicted of murder under the current law, he can no longer be convicted of murder since the only valid theory of liability is limited to first degree murder. " 'The law of the case doctrine states that when, in deciding an appeal, an appellate court "states in its opinion a principle or rule of law necessary to the decision, that principle or rule becomes the law of the case and must be adhered to throughout its subsequent progress, both in the lower court and upon subsequent appeal . . . , and this although in its subsequent consideration this court may be clearly of the opinion that the former decision is erroneous in that particular." [Citations.]' [Citation.]" (*People v. Alexander* (2010) 49 Cal.4th 846, 870.)

*People v. Hernandez* (2021) 60 Cal.App.5th 94 (*Hernandez*) rejected the same claim as made here, finding it was not supported by the law of the case doctrine or by the manner in which section 1170.95 operates. Hernandez was convicted of first degree murder under a felony-murder theory of liability. (*Hernandez, supra*, at pp. 101-102.) On appeal, his conviction was reduced to second degree murder because the jury had failed to specify the degree of felony murder. (*Id*. at p. 102.) Hernandez later filed a section 1170.95 petition, which the trial court denied because he still could be convicted of first degree murder under a felony-murder theory pursuant to section 189, subdivision

18

(f) because a police officer had been killed.[4] (*Hernandez*, at pp. 103-104.) On appeal, Hernandez claimed the prior reduction of his conviction to second degree murder precluded a felony murder conviction under current law as second degree felony murder did not exist after Senate Bill 1437. (*Hernandez*, at pp. 109-110.) The *Hernandez* court found that the trial court properly denied Hernandez's petition, because if Hernandez was tried under current law, Hernandez could be convicted of first degree murder under section 189, subdivision (f). (*Hernandez*, at p. 110.)

The *Hernandez* court also found that even if the law of the case were relevant, the intervening change in the law exception precluded its application. (*Hernandez, supra*, 60 Cal.App.5th at p. 110.) Hernandez's conviction had been reduced to second degree murder pursuant to *People v. McDonald* (1984) 37 Cal.3d 351, which held that where the jury finds the defendant guilty of murder under a felony-murder theory but does not specify the degree of murder, section 1157 required the conviction be deemed second degree murder. (*McDonald, supra*, at p. 382; *Hernandez*, at pp. 102, 110.) In 2000, long after Hernandez's conviction was modified to second degree murder, the Supreme Court overruled *McDonald* where, as in Hernandez's case, the jury was instructed on first degree felony murder. (*People v. Mendoza* (2000) 23 Cal.4th 896, 914.) This was an intervening change in the law which precluded any application of the law of the case to Hernandez's petition. (*Hernandez*, at p. 111; *Clemente v. State of California* (1985) 40 Cal.3d 202, 212 ["The principal ground for making an exception to the doctrine of law of the case is an intervening or contemporaneous change in the law"].) Finding Hernandez

---

**4** Section 189, subdivision (f) provides that the limitations on liability for felony murder in section 189, subdivision (e) do "not apply to a defendant when the victim is a peace officer who was killed while in the course of the peace officer's duties, where the defendant knew or reasonably should have known that the victim was a peace officer engaged in the performance of the peace officer's duties."

19

was liable for felony murder under section 189, subdivision (f), the Court of Appeal affirmed the denial of his petition. (*Hernandez*, at p. 114.)

We agree with *Hernandez* and accordingly reject defendant's contention. As stated previously in this opinion, section 1170.95 proceedings are not a trial at which guilt is established, but a means by which a prisoner can collaterally attack an otherwise valid, final conviction. Just as the right to a jury trial is inapplicable to this proceeding, law of the case, as applied to our prior modification of the conviction to second degree murder, is likewise inapplicable. Furthermore, even if law of the case applied, as in *Hernandez*, *McDonald*'s overruling of *Mendoza* renders the law of the case doctrine inapplicable under the intervening change in the law exception.

If defendant were prosecuted today, he could be prosecuted for first degree murder under a felony-murder theory. Our decision to modify his conviction to second degree murder in reliance on a now overruled Supreme Court decision does not preclude a finding that he is ineligible for relief under section 1170.95.

B.      *Striking the felony-murder special circumstance*

Defendant also argues in a supplemental brief that because we struck the jury's special circumstance finding on direct appeal, we implicitly found he was not a major participant who acted with reckless indifference to human life in the underlying robbery. As a result, defendant contends he was entitled to resentencing without an evidentiary hearing. We disagree, as we made no such factual finding on direct appeal, implicit or otherwise.

Defendant's argument relies on section 1170.95, subdivision (d)(2), which provides that "[i]f there was a prior finding by a court or jury that the petitioner did not act with reckless indifference to human life or was not a major participant in the felony, the court shall vacate the petitioner's conviction and resentence the petitioner." But here, there was no such prior finding. Rather, as discussed, on direct appeal we applied section 1157 to vacate the special circumstance finding and reduce defendant's conviction to

second degree murder because the verdict forms did not specify a degree of murder. We made no special circumstance finding based on the sufficiency of the evidence.

Here, we struck the special circumstance finding for procedural, rather than evidentiary, reasons; thus, defendant's reliance on *People v. Clayton* (2021) 66 Cal.App.5th 145 is misplaced. In *Clayton*, the jury found beyond a reasonable doubt that the special circumstance allegation was untrue, which the appellate court concluded was a prior finding within the meaning of section 1170.95, subdivision (d)(2), entitling the defendant to resentencing. (*Clayton, supra*, at pp. 154-155, 157-159.) Here, by contrast, we did not assess whether the special circumstance allegation was factually supported. We merely struck the special circumstance finding because the verdict form failed to specify the degree of murder. Accordingly, section 1170.95's automatic resentencing provision does not apply.

Finally, we note that, although not raised by the parties, the jury's finding that defendant was a major participant who acted with reckless indifference to human life does not affect our analysis. Typically, a special circumstance finding under section 190.2, subdivision (a)(17) disqualifies a defendant from section 1170.95 relief. (See, e.g., *People v. Gomez* (2020) 52 Cal.App.5th 1, review granted Oct. 14, 2020, S264033; *People v. Allison* (2020) 55 Cal.App.5th 449 [concluding the special circumstance finding renders a petitioner ineligible for relief as a matter of law and defendants seeking relief on the basis of *Banks/Clark* must do so through habeas corpus].)

But in this case, we struck the special circumstance finding on direct appeal due to a legal deficiency. "[A] striking is an unconditional deletion of the legal efficacy of the stricken allegation or fact for purposes of a specific proceeding. . . . It is tantamount to a dismissal. In particular, the striking of an enhancement implies that the enhancement is legally insupportable, and must be dismissed in furtherance of justice." (*People v. Santana* (1986) 182 Cal.App.3d 185, 190-191, fn. omitted.) Dismissed or vacated allegations are not part of the record of conviction because they no longer provide a basis

21

for the conviction.  (Cf. *People v. Trujillo* (2006) 40 Cal.4th 165, 179.)  As the jury's special circumstance finding was dismissed, the trial court properly declined to rely on it when assessing defendant's petition.

## DISPOSITION

The judgment (order) is affirmed.


      KRAUSE      , J.


We concur:


      DUARTE      , Acting P. J.


      RENNER      , J.